THE ILLINOIS DEVELOPMENT FINANCE AUTHORITY *et al.,* Plaintiffs-Appellants, v. RONALD BEAN, Executive Director, Illinois Development Finance Authority, Defendant-Appellee.

First District (2nd Division)  No. 85—182

Opinion filed November 12, 1985.—Rehearing denied December 10, 1985.

Chapman & Cutler, of Chicago (James E. Spiotto, Ann Acker, and Maureen W. Fairchild, of counsel), for appellants.

Isham, Lincoln & Beale, of Chicago (Julian C. D'Esposito, Jr., and Robert T. Isham, Jr., of counsel), for appellee.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:

This is an appeal from the denial of plaintiff's motion for summary judgment and the granting of defendant's motion for summary judgment. Plaintiffs, Illinois public utilities, sought a declaration that certain construction projects proposed by them fell within the scope of the Illinois Development Finance Authority Act and were therefore financeable through tax-exempt Illinois bond issues. The trial court heard oral arguments on the parties' cross-motions for summary judgment and held in favor of defendant.

The Illinois Development Finance Authority (IDFA) is a political subdivision of the State of Illinois created by the Illinois Development Finance Authority Act (ACT). (Ill. Rev. Stat. 1983, ch. 48, par. 850.01 et seq.) Pursuant to the ACT, IDFA has the authority to finance the construction and improvement of industrial projects for the purpose of promoting and maintaining employment in Illinois. Bean is the Executive Director of IDFA, and has principal authority for the operation of IDFA and for compliance with its resolutions.

North Shore Gas and Peoples Gas are public utilities engaged in the distribution of natural gas in Cook and Lake Counties. Their sale of natural gas for residential use is regulated by the Illinois Commerce Commission.

On June 20, 1984, IDFA authorized, by resolution, the issuance of a maximum of $15 million in revenue bonds to finance a gas pipeline replacement and expansion program proposed by North Shore Gas. The project was expected to employ 40 North Shore Gas employees and 46 outside contractors. The IDFA resolution directed Bean to publish a notice and conduct a public hearing on the financing. Also on June 20, IDFA authorized a $200 million bond issue for a similar project proposed by Peoples Gas, which was expected to create 23 jobs. Each proposed project concerns improvements to pipes, mains, meters and storage facilities used by the utility. The advantage to the utilities in financing their projects through IDFA lies in the tax-exempt status of IDFA financing.

The IDFA's resolutions approving these bond issues are based upon recommendations made by the utilities' expert, Speer Financial, Inc. This report recommended approval because the projects would preserve or create jobs, reduce consumer utility rates due to interest savings on the tax-exempt debt, and result in an improved natural gas

system. The report qualified its recommendation on the ground that: (1) the utilities are captive industries and cannot move their facilities to other States; (2) the projects will go forward in some form even without tax-exempt financing; and (3) the projects cannot be said to directly maintain or obtain employment.

On September 25, 1984, North Shore Gas received a letter from Bean stating that he would not take any action to effectuate the bond issues absent a judicial determination that; (1) the projects fall within the definition of financeable projects set forth in section 3(c) of the Act (Ill. Rev. Stat. 1983, ch. 48, par. 850.03(c)); and (2) the project's indirect employment benefits satisfy the purpose of the Act with regard to improving employment in Illinois.

On October 10, 1984, North Shore Gas and IDFA filed a verified complaint in the circuit court of Cook County seeking a declaratory judgment that the project was authorized by the Act. Bean answered, and cross-motions for summary judgment were filed.

On November 14, 1984, Peoples Gas applied to IDFA to amend its June 20, 1984, resolution in order to reduce the size of the financing to authorize $30 million in revenue bonds for the Will and Champaign counties portion of the project. On December 3, 1984, Peoples Gas received a letter from Bean virtually identical to the one received by North Shore Gas. On December 11, Peoples Gas and IDFA filed a similar declaratory judgment action. This action was consolidated with the North Shore Gas suit and heard as well on cross-motions for summary judgment.

Plaintiffs argue that the trial court erred in its ruling on the parties' summary judgment motions. The principles governing the granting or denying of a motion for summary judgment are well established. "A motion for summary judgment should be granted if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (*State Farm Mutual Automobile Insurance Co. v. Schmitt* (1981), 94 Ill. App. 3d 1062, 1063, 419 N.E.2d 601, 602.) In the instant case the facts are not in dispute. The only question, therefore, is whether the trial court was correct in finding that defendant was entitled to summary judgment as a matter of law.

Plaintiffs contend that public utility projects qualify as "industrial projects" as defined by section 3(c) of the Act (Ill. Rev. Stat. 1983, ch. 48, par. 850.03(c)). The Act empowers IDFA to issue bonds for industrial projects located within areas of critical labor surplus. (Ill. Rev. Stat. 1983, ch. 48, par. 850.05.) The term "industrial project" is defined by section 3(c) of the Act, which reads as follows:

"(c) The term 'industrial project' or 'project' means (1) capital project, including one or more buildings and other structures, improvements, machinery and equipment whether or not on the same site or sites now existing or hereafter acquired, suitable for use by any manufacturing, industrial, research, transportation or commercial enterprise, including but not limited to use as a factory, mill, processing plant, assembly plant, packaging plant, fabricating plant, office building, industrial distribution center, warehouse, repair, overhaul or service facility, freight terminal, research facility, test facility, railroad facility, commercial facility, and including also the sites thereof and other rights in land therefor whether improved or unimproved, site preparation and landscaping, and all appurtenances and facilities incidental thereto such as utilities, access roads, railroad sidings, truck docking and similar facilities, parking facilities, dockage, wharfage, railroad roadbed, track, trestle, depot, terminal, switching and signaling equipment or related equipment, and other improvements necessary or convenient thereto; or (2) any land, buildings, machinery or equipment comprising an addition to or renovation, rehabilitation or improvement of any existing capital project." (Ill. Rev. Stat. 1983, ch. 48, par. 850.03(c).)

Plaintiffs contend that the two projects qualify as improvements to a "commercial" or "service" facility for use by a "commercial enterprise" and therefore fit within the Act's definition of an "industrial project." However, an examination of the Act does not support this contention.

■ Under the principles of statutory construction, the court's task in the instant case is "to ascertain and give effect to the intent of the legislature, arriving at such intention not only from the language employed in the legislation, but also from the reason and necessity for the law, the evils to be remedied, and the objects and purposes to be obtained." (*Mid-South Chemical Corp. v. Carpentier* (1958), 14 Ill. 2d 514, 517, 153 N.E.2d 72, 74.) "[A] statute itself affords the best means of its exposition, and if the legislative intent can be ascertained from the provisions of the statute that intent will prevail without resort to other aids for its construction." 14 Ill. 2d 514, 518.

Under section 3(c), to come within the statutory definition of an "industrial project" a project must satisfy two criteria. It must be a capital project and it must be suitable for use by a "manufacturing, industrial, research, transportation or commercial enterprise."

Defendant concedes that the utility projects are "capital pro-

jects," but contends that they are not suitable for use by a manufacturing, industrial, research, transportation or commercial enterprise. Plaintiffs contend that the projects are "commercial enterprises" under the Act. However, an examination of the Act leads this court to the conclusion that the term "commercial enterprise," as used in the Act, does not include a public utility.

■■ "[W]ords employed in a statute should be given their plain and ordinary, or commonly accepted or popular, meaning unless to do so would defeat the legislative intent." (*Droste v. Kerner* (1966), 34 Ill. 2d 495, 503, 217 N.E.2d 73, 78.) Plaintiffs argue that the term "commercial enterprise" in its commonly accepted usage includes all businesses, that "commerce" is the buying and selling of goods, and that natural gas is a goods under the Uniform Commercial Code. Plaintiffs argue, therefore, that because they buy and sell gas they are "commercial enterprises" under section 3(c) of the Act.

Plaintiffs argue that the term "commercial enterprise" encompasses all business. However, the term "commercial," as used in section 3(c), is no more general than any of the terms that precede it in the statute. The statute defines the types of enterprises to which it applies as "any manufacturing, industrial, research, transportation or commercial enterprise." Therefore, "commercial" enjoys its own meaning as a nonindustrial, nonmanufacturing aspect of business, and it involves the exchange of goods or services. The context in which it is used in the statute clearly shows that "commercial" describes an aspect of business, rather than all business.

Plaintiffs next argue that they sell goods and are therefore "commercial enterprises." However, it is clear that public utilities are commonly regarded as different from other commercial enterprises because of their regulated status. This attitude is shown by the use of the term "utilities" in section 3(c) as an example of "appurtenances and facilities incidental" to a manufacturing, industrial, research, transportation or commercial enterprise, which indicates that utilities are not to be included among the enterprises covered by the Act. The legislature's exclusion of utilities from the list of included enterprises evidences its intention to exclude utilities from the purview of the statute. See *McDonald's Corp. v. DeVenney* (Ala. 1982), 415 So. 2d 1075, 1080.

Plaintiffs also argue that their proposed projects should be considered "service facilities" as that term is used in section 3(c) because public utilities have traditionally been viewed as providing services of a specific type. The pertinent part of section 3(c) provides, "including but not limited to, use as a factory, mill, processing plant, assembly

plant *** warehouse, repair, overhaul or service facility, ***." Because "repair, overhaul or service" are used in series to describe certain facilities, each term takes its meaning from the series, and "service facility" must be read in the context of "repair" and "overhaul," indicating that the servicing of equipment is what is meant. Read in the context in which it is used in section 3(c), "service facility" does not mean a facility which provides utility service to the public, but rather a facility for the repair, overhaul and servicing of equipment.

Furthermore, an examination of case law reveals that the Illinois courts have not viewed public utilities as "commercial enterprises." In *Peoples Gas Light & Coke Co. v. Ames* (1935), 359 Ill. 152, 194 N.E. 260, Peoples Gas argued successfully that a public utility was not subject to the Retailers' Occupation Tax because it was a peculiar class of business enterprise, distinct from the business of selling tangible personal property at retail. (359 Ill. 152, 154-58.) Similarly, in *People ex rel. Mercer v. Wyanet Electric Light Co.* (1923), 306 Ill. 377, 137 N.E. 834, our supreme court recognized that public utilities are not formed for a purely mercantile purpose as are other corporations, but "form a particular class by themselves and are regulated by special provisions of our statute known as the Public Utilities Act" (306 Ill. 377, 381) and therefore should be assessed for taxation at the State rather than local level.

■ These decisions embody the rule under Illinois law that a public utility distributing and selling gas to industrial, business or residential users is not typically grouped with commercial enterprises. The difference lies in the fact that the business carried on by public utilities requires the imposition of certain service obligations not imposed by law on other businesses, and requires the assumption of certain responsibilities by the State to assure the utility a reasonable rate of return, while still safeguarding the public. (*Peoples Gas Light & Coke Co. v. Ames* (1934), 359 Ill. 152, 156-57, 194 N.E. 260, 262.) A utility is required by law to provide service to all the public, and its rates are regulated by the public through the Illinois Commerce Commission. Just as this difference in character justified the exemption of utilities from taxes imposed on other commercial activity, it requires separate treatment of utilities for tax-exempt financing under industrial development bond statutes.

Defendant further urges this court to find that, because public utilities do not require the tax incentive provided by the Act to locate or expand in Illinois, as other business entities might, they are not intended to be financeable under the Act.

Section 2 of the Act contains the legislative declaration of policy,

which states the purpose of the Act as "promoting, attracting, stimulating and revitalizing industry, manufacturing and commerce, *** encouraging the development of commercial businesses and industrial and manufacturing plants within labor surplus areas of the State, *** attract[ing] new industrial and manufacturing facilities into such areas *** [and] assist[ing] in the construction of new, and in the retention and continued improvement and utilization of existing commercial, industrial and manufacturing facilities in such areas." (Ill. Rev. Stat. 1983, ch. 48, par. 850.02.) Because public utilities are "captive" within the State, are governed by the Public Utilities Act with provision for rates required to meet approved debt issues, and enjoy a limited monopoly status, unlike other business, they clearly have little or no need for the aid provided by the Act. We therefore find that advantageous financing of public utility projects under the Act will not further the stated purposes of the Act.

In addition, an examination of the legislative history of the Act supports the conclusion that public utility projects are not "industrial projects" as defined by section 3(c) of the Act. The original version of the Act was passed in 1961 and entitled "the Illinois Industrial Development Authority Act." (Ill. Rev. Stat. 1961, ch. 48, par. 831 *et seq.*) This original version of the Act defined the term "industrial project" as follows:

> "(c) The term 'industrial project' means any site and structure comprising or being connected with or being a part of an industrial or manufacturing facility which site and structure is to be developed and constructed or acquired in whole or in part with funds of the Illinois Industrial Development Authority; except an industrial project as above defined which would compete with any existing privately owned public utility rendering a service to the public at rates or charges subject to regulation by the Illinois Commerce Commission, unless the Illinois Commerce Commission determines that in the area to be served by the industrial project there is need for an increase in such service (taking into consideration reasonably foreseeable future needs) which the existing public utility is not able to meet through its existing facilities or through an expansion which it agrees to undertake." (Ill. Rev. Stat. 1961, ch. 48, par. 833(c).)

This language indicates that the Act was intended solely to apply to industrial and manufacturing entities and reflects a clear dichotomy between "privately owned public utilities rendering a service to the public at rates or charges subject to regulation by the Illinois Commerce Commission" and "industrial or manufacturing facilit[ies]." The

language of this section indicates that the legislature intended to protect public utilities, which lacked access to tax-exempt financing, from industrial projects entitled to such financing which might supply their own sources of energy to the competitive detriment of the utilities.

The language excepting industrial projects which would compete with public utilities did not survive subsequent amendments to the Act. However, examination of transcripts of debate on a 1980 amendment to section 3(c), which included "commercial" projects within the definition of "industrial projects," indicates that the Act was intended by the legislature to be used to finance small business in Illinois. (Senate Debates, H.B. 821, June 25, 1980, at 198-99; Senate Debates, H.B. 821, 3rd Reading, June 26, 1980, at 16; House Debates, H.B. 821, June 30, 1980, at 233-35; see also W. Redmond, Speaker, Illinois House of Representatives, "Recent Accomplishments of the General Assembly Designed to Improve Business, Economic and Employment Conditions in Illinois" at 11, General Assembly (Oct. 1980).) These statements provide no support for plaintiff's contention that the Act was intended to aid public utilities. Rather, the debates indicate that the legislature was concerned with attracting new business enterprises to Illinois, a purpose which would not be served by providing economic incentives to utilities, which cannot be moved from State to State. The financing of public utility projects clearly would not serve the Act's stated purpose of providing employment in Illinois.

██ Plaintiffs cite public financing acts from several other States under which public utility projects have been financed. However, an examination of these statutes reveals that, while public utility projects are funded by other States, such financings are undertaken with specific statutory reference to public utility projects, rather than in reliance on a general statutory authorization for financings of "commercial enterprises." (N.Y. Energy Law secs. 1851(13), 1854, 1855(11) (McKinney 1981); N.J. Stat. Ann. sec. 34:1B—3 (West Supp. 1984); Ariz. Rev. Stat. Ann. sec. 9—1151(8)(a)(ii).) If the Illinois General Assembly intended to include public utility projects within its definition of "industrial project," it would have done so expressly. Because no such expressed inclusion appears in section 3(c), we find that the Act was not intended to be used to finance public utility projects.

Furthermore, it does not appear that the financing of either proposed project will increase job opportunities or retain existing jobs in Illinois. The only direct effect these projects would have on employment in Illinois is, according to plaintiffs' expert, the creation of a nominal number of temporary construction jobs and the improvement of the State's gas supply system, which would make Illinois more at-

tractive to new industry. However, tax-exempt financing of the proposed projects would not enhance this effect to any great extent because it has been shown that the utilities will make needed improvements regardless of the type of financing they obtain. Therefore, financing of plaintiffs' proposed projects by IDFA would have no measurable effect on the creation of new industry or the retention of existing industry in Illinois, and would not satisfy the stated purpose of the Act.

The order of the circuit court granting summary judgment in favor of defendant is affirmed.

Affirmed.

HARTMAN and BILANDIC, JJ., concur.